UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

ARTHUR WEST

                                                             Plaintiff,    **COMPLAINT AND JURY DEMAND**

              -against-

CITY OF NEW YORK, POLICE OFFICER ORLANDO SANCHEZ #13382, DETECTIVE RASHON LACOSTE #2285, DETECTIVE KEVIN DESORMEAU #3787 AND JOHN DOE #1-3,

                                                 Defendants.

------------------------------------------------------------------------ x

## PRELIMINARY STATEMENT

1. This is a civil rights action in which plaintiff seeks relief through 42 U.S.C. §§ 1983 and 1988 for the violation of his civil rights protected by the Fourth and Fourteenth Amendments.

2. The claim arises from an August 27, 2015 incident in which officers of the New York City Police Department ("NYPD"), acting under color of state law, intentionally and willfully subjected plaintiff to, among other things, false arrest, malicious prosecution and excessive force.

3. Plaintiff seeks monetary damages (special, compensatory, and punitive) against defendants, as well as an award of costs and attorneys' fees, and such other and further relief as the Court deems just and proper.

## JURISDICTION

4. This action arises under the Fourth and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. §§ 1983 and 1988.

5. The jurisdiction of this court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3) and (4),

1367(a) and the doctrine of pendent jurisdiction.

**VENUE**

6. Venue is laid within the Eastern District of New York in that Defendant City of New York is located within and a substantial part of the events giving rise to the claim occurred within the boundaries of the Eastern District.

**PARTIES**

7. Plaintiff West resided at all times here relevant in Kings County, City and State of New York.

8. The City of New York ("City") is a municipal corporation organized under the laws of the State of New York. At all times relevant hereto, Defendant City, acting through the NYPD, was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and was responsible for the appointment, training, supervision, discipline and retention and conduct of all NYPD personnel. In addition, at all times here relevant, Defendant City was responsible for enforcing the rules of the NYPD, and for ensuring that the NYPD personnel obey the laws of the United States and the State of New York.

9. Defendant Officers Sanchez, Lacoste and Desormeau were, at all times here relevant, police officers of the NYPD, and as such were acting in the capacity of agents, servants, and employees of the City of New York. On information and belief, at all times relevant hereto, defendant officers were involved in the decision to arrest plaintiff without probable cause or failed to intervene in the actions of their fellow officers when they observed them arresting plaintiff without probable cause. Upon information and belief, defendant officers were under the command of the Brooklyn North Gang Unit on the date of the incident. Officers Sanchez, Lacoste and Desormeau are sued in their individual capacities.

10. Police Officers John Doe #1-3, whose true identities are currently unknown to plaintiff, were, at all times here relevant, police officers of the NYPD, and as such were acting in the capacity of agents, servants, and employees of the City of New York. On information and belief, at all times relevant hereto, defendant officers were involved in the decision to arrest plaintiff without probable cause or failed to intervene in the actions of their fellow officers when they observed them arresting plaintiff without probable cause. Upon information and belief, defendant officers were under the command of the Brooklyn North Gang Unit on the date of the incident. Defendants John Does are sued in their individual capacities.

11. At all times here mentioned, defendants were acting under color of state law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the City and State of New York.

## FACTUAL ALLEGATIONS

12. On August 27, 2015 plaintiff was visiting family inside of 2058 Union St, Brooklyn, NY. Plaintiff was spending the night in his uncle's bedroom when, at approximately 12:30AM, NYPD officers, including the defendant officers, entered the home. Several other family members were also in the apartment when the officers stormed in.

13. Upon hearing the commotion of the officers entering the home, plaintiff came out of his uncle's room. The officers ordered him to stand by the kitchen area. Plaintiff complied. Moments later, he heard an officer say "arrest him" and he was taken to the ground. Once on the ground, plaintiff was struck by the officers and handcuffed.

14. Plaintiff and another male were taken from the home and placed in a police car. They were taken to the 73rd precinct, searched and fingerprinted. More than twenty four hours after his arrest, plaintiff was brought before a criminal court judge and arraigned on felony charges in

connection with a firearm allegedly found not on or near plaintiff but in a locked box in another bedroom. Bail was set and plaintiff was sent to Rikers Island until his bail was paid four days later. On September 18, 2015, the Kings County District Attorney dismissed all charges because the grand jury voted a No True Bill.

15. At all times during the events described above, Defendant police officers were engaged in a joint venture and formed an agreement to violate Plaintiff's rights. The individual officers assisted each other in performing the various actions described and lent their physical presence and support and the authority of their office to each other during said events. They failed to intervene in the obviously illegal actions of their fellow officers against plaintiff.

16. During all of the events above described, defendants acted maliciously and with intent to injure plaintiff.

## DAMAGES

17. As a direct and proximate result of the acts of Defendants, plaintiff suffered the following injuries and damages:

   a.   Violation of his rights pursuant to the Fourth Amendment of the United States Constitution to be free from an unreasonable search and seizure of their persons;

   b.   Violation of his rights pursuant to the Fourteenth Amendment of the United States Constitution to due process;

   c.   Physical pain and suffering;

   d.   Emotional trauma and suffering, including fear, embarrassment, humiliation, emotional distress, frustration, extreme inconvenience, anxiety;

   e.   Loss of liberty.

## FIRST CAUSE OF ACTION
42 U.S.C. § 1983

18. The above paragraphs are here incorporated by reference.

19. The officer defendants wrongfully, illegally, and unjustifiably arrested, detained, imprisoned, falsely charged and maliciously prosecuted plaintiff and used excessive force against him, depriving him of his liberty.

20. The wrongful, unjustifiable, and unlawful apprehension, arrest, detention, prosecution and imprisonment of plaintiff was carried out without a valid warrant, without plaintiff's consent, and without probable cause or reasonable suspicion.

21. At all relevant times, defendants acted forcibly in apprehending, arresting, and imprisoning plaintiff.

22. All of this occurred without any illegal conduct by plaintiff.

23. The officer defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their respective employment as NYPD officers.  Said acts by officer defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said defendants acted willfully, knowingly and with the specific intent to deprive plaintiff of his constitutional rights secured by the United States Constitution.

24. As a direct and proximate result of the misconduct and the abuse of authority detailed above, plaintiff sustained the damages described above.

## SECOND CAUSE OF ACTION
42 U.S.C. § 1983
MUNICIPAL LIABILITY

25. The above paragraphs are here incorporated by reference.

26. The City is liable for the damages suffered by plaintiff because, after learning of its

employees' violations of New Yorkers' constitutional rights, the City has: failed to remedy the wrong; created a policy or custom under which unconstitutional practices regularly occur and even thrive; and has been grossly negligent in managing subordinates who cause the unlawful events. The result of the City's inaction is a culture within the NYPD where the same officers, the same units, and the same precincts repeatedly and routinely engage in acts of misconduct. By failing to properly train, supervise, and discipline its employees, agents, and servants, the City effectively encourages illegal, immoral, and unprofessional behavior.

27. On numerous occasions over the span of many years, the City of New York has been alerted to the regular use of excessive force and the frequency of false arrests charges brought by its police officers. Despite having acquired such knowledge, the City has refused to appropriately sanction its employees' illegal behavior.

28. The City's deliberate indifference to civil rights violations committed by individual police officers, as well as patterns of misconduct committed by the same officers or occurring in the same precinct has caused the constitutional violations against Plaintiff in this case.

THE CITY FAILS TO TRACK LAWSUITS, THEREBY SEVERING ANY POTENTIAL DETERRENT VALUE OF CIVIL RIGHTS ACTIONS

29. The City has been aware for some time – from civil rights lawsuits, Notices of Claim, complaints filed with the Civilian Complaint Review Board ("CCRB"), City Council hearings, newspaper reports, criminal cases resulting in declined prosecutions and dismissals, and judicial rulings suppressing evidence and finding officers incredible as a matter of law – that a disturbing number of NYPD officers unlawfully search and seize citizens without probable cause, bring charges against citizens with no legal basis, perjure themselves in charging instruments and through testimony, and fail to intervene in and report the obviously illegal actions of their fellow officers.

30. It is well documented that the number of claims against the NYPD has doubled in recent years and has cost taxpayers more than $1 billion.[1] Despite these staggering figures, the City has repeatedly resisted attempts to catalog even the most basic information gleaned from civil rights lawsuits that could improve training, leadership, supervision, and discipline in the NYPD. Although certain police officers, units, and precincts have been found to have violated New Yorkers' constitutional rights *repeatedly*, the City refuses to track the data.[2]

31. Courts – including this nation's highest court – assume that civil rights lawsuits deter police misconduct. *See Wyatt v. Cole*, 504 U.S. 158, 161 (1992) ("The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails.") (citing *Carey v. Piphus,* 435 U.S. 247, 254-257 (1978)); *Hudson v. Michigan*, 547 U.S. 586, 598 (2006) ("As far as we know, civil liability is an effective deterrent [to civil rights violations], as we have assumed it is in other contexts.") (citing *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 70 (2001)

---

[1] *See* Barry Paddock, Rocco Parascandola, John Marzulli, & Dareh Gregorian, *Exclusive: Detective is NYPD's most-sued cop, with 28 lawsuits filed against him since 2006*, N.Y. DAILY NEWS, Feb. 16, 2014, http://www.nydailynews.com/new-york/lawsuits-nypd-double-decade-costing-taxpayers-1b-article-1.1615919#ixzz2ttdX4ZkE (reporting that the number of claims against the NYPD doubled between 2004-2014, to a record high of 9,570 lawsuits filed in 2012, costing taxpayers nearly $1 billion); Colleen Long & Jennifer Peltz, Associated Press, *Nearly $1B in NYC police payouts*, Yahoo! News (October 14, 2010, 7:44 PM), http://news.yahoo.com/ap-investigation-nearly-1b-nyc-police-payouts.html (reporting that, in the decade ending in 2010, the City paid out nearly one billion dollars to resolve claims against the NYPD); Caroline Bankoff, *The City Has Paid Almost Half a Billion Dollars in NYPD-Related Settlements Over the Past 5 Years*, NYMag.com, Oct. 12, 2014, http://nymag.com/daily/intelligencer/2014/10/428-million-in-nypd-related-settlements-paid.html (reporting that, between 2009-2014, New York City paid out more nearly $500 million to settle NYPD-related cases); see also City of New York, Office of the Comptroller Claims Report FY 2012, 30, June 4, 2013, https://www.documentcloud.org/documents/1375759-fy-2012-claims-report.html (noting that, in fiscal year 2012, so-called "police action claims," which are claims that result from false arrest or imprisonment, police shootings, excessive use of force, assault, or failure to protect, cost the City $64.4 million, and that in fiscal year 2011, the City paid out $60.2 million in police action claims).

[2] *See, e.g.*, Barry Paddock, et al., *Exclusive: Detective is NYPD's most-sued cop, with 28 lawsuits filed against him since 2006*, N.Y. DAILY NEWS, Feb. 16, 2014, http://www.nydailynews.com/new-york/lawsuits-nypd-double-decade-costing-taxpayers-1b-article-1.1615919#ixzz2ttdX4ZkE ("The [Daily] News' investigation was centered around the results of a Freedom of Information Law request for a list of lawsuits filed against officers who have been sued 10 or more times over the past decade. The city Law Department provided the names of 51 officers and 463 cases. A News search found an additional 146 cases against the officers, and four other officers who should have been included in the response — calling into question the city's ability to track these cases.").

and *Nix v. Williams,* 467 U.S. 431, 446, (1984)).

32. However, because the City of New York refuses to track civil rights lawsuits, such suits do not serve the deterrent purpose envisioned by the Supreme Court. By failing to keep track of this crucial data – which could save lives as well as taxpayer money – the City has created a system in which lawsuits are severed from any potential deterrent effect.

THE CITY FAILS TO TRACK THE RESULTS OF SUPPRESSION HEARINGS AND OTHER PROCEEDINGS WHERE OFFICERS ARE FOUND INCREDIBLE AS A MATTER OF LAW

33. The City is liable to Plaintiff for its failure to keep track of judicial decisions in suppression hearings where police officers have been found to have fabricated testimony.

34. There are hundreds of published decisions from the past several years in which judges in New York City courtrooms determine that, as a matter of law, police officers have testified incredibly, conducted illegal searches and seizures, and even suborned perjury.

35. Judicial decisions from suppression hearings and trials are particularly reliable indicators of a police officer's professional conduct and credibility because the testimony has been tested in open court, under oath.

36. Yet those in a position of authority – such as NYPD supervisors and prosecutors – do not monitor or report these findings.

37. Furthermore, the City has no procedure to notify individual officers or their supervisors of adverse judicial findings. Without this notification, improper search and seizure practices and incredible testimony go uncorrected, problematic supervision or leadership at the precinct level goes ignored, and repeated misconduct by individual officers goes unaccounted for.

THE CITY FAILS TO HOLD POLICE OFFICERS PERSONALLY LIABLE, RESULTING IN A COMPLETE LACK OF ACCOUNTABILITY

38. The City of New York is also liable in this case because, by habitually indemnifying

police officers who have acted unconstitutionally, the City isolates such officers from accountability.[3] The effect – yet again – is that civil rights lawsuits do not serve a deterrent purpose. "It is almost axiomatic that the threat of damages has a deterrent effect, *surely particularly so when the individual official faces personal financial liability*." *Carlson v. Green*, 446 U.S. 14, 21, (1980) [emphasis added] (citing *Imbler v. Pachtman*, 424 U.S. 409, 442 (1976)) [footnote omitted].

39.   Furthermore, civil rights lawsuits against NYPD officers have no impact on the officers' careers, regardless of the expense to the City to defend a police misconduct case, and even when the same officers are named in multiple lawsuits, because settlements of civil claims are ordinarily not even noted in an officer's personnel file.[4]

40.   For decades, the City has been on notice that certain officers and precincts are disproportionately responsibility for civil rights lawsuit liability. Nonetheless, the City has failed to take action to hold officers or precincts accountable, and has failed to investigate to what extent certain officers, units, and precincts are disproportionately responsible.

41.   In 1999, Comptroller Alan Hevesi, in a memo to Police Commissioner Howard Safir, stated that there was "a total disconnect" between the settlements of civil claims – even substantial ones – and NYPD discipline of officers.[5] Hevesi continued:

> As a result, the NYPD does not learn of potential problem officers, fails to take curative action, and not infrequently fosters a situation in which an officer will engage in another act of violation,

---

[3] *See* Eric Jaffe, *When Cops Violate Civil Rights, It's City Taxpayers Who Pay*, CITYLAB, Dec. 4, 2014, http://www.citylab.com/crime/2014/12/when-cops-violate-civil-rights-its-city-taxpayers-who-pay/383419/ (reporting that taxpayers almost always satisfy both compensatory and punitive damages awards entered against police officers).

[4] Association of the Bar of the City of New York, Committee on New York City Affairs, "The Failure of Civil Damages Claims to Modify Police Practices, and Recommendations for Change," March 2000, *available at* http://www2.nycbar.org/Publications/reports/print_report.php?rid=32.

[5] *Id*.

>resulting in harm to another person and further damages from the City. More important, study of a large number of cases might well reveal patterns of misconduct against which the NYPD could and should take systematic management action.[6]

42. The Comptroller recommended that the police department "analyze . . . settled claims, and take steps to review the officers' performance and propensity to commit acts of excessive force."[7]

43. The City has not heeded Hevesi's advice, and the "total disconnect" remains fully in place today. The pattern is now all too familiar: the City pays vast sums of money to resolve cases where New Yorkers' constitutional rights have been violated, while the NYPD does nothing to financially incentivize its officers to change their behavior, and fails to investigate or address the underlying causes of such violations.

THE CITY FAILS TO DISCIPLINE ITS OFFICERS, THUS ALLOWING UNLAWFUL BEHAVIOR TO GO UNCHECKED

44. The City is liable because it has created a legal system in which officer misconduct routinely goes unpunished.

45. The City has purported to attempt to address police officers' abuse of authority, in part through the creation of the CCRB, a police oversight agency with investigative powers.

46. However, the CCRB has proved vastly inadequate.

47. First, the CCRB fails in its mission because it often finds complainants "lack credibility" based on the fact that the complainant has also brought a civil rights lawsuit. The result is that the CCRB often fails to substantiate some of the most serious allegations.

48. Second, when the CCRB has determined that officers have made false statements to the CCRB in their own defense, the CCRB virtually never initiates its own findings against those

---

[6] *Id.*

[7] *Id.*

dishonest officers. The same is true in situations where the CCRB finds that officers have failed to report their fellow officers' misconduct.

49. Third, because the CCRB's penalty recommendations are purely advisory and there is no enforcement mechanism, the recommendations have no binding effect on the NYPD or its officers. Even when the CCRB substantiates complaints, the police department rarely imparts its own discipline on the officer, and often simply drops the complaints.[8]

50. Fourth, the NYPD Department Advocate, which is endowed with the responsibility of following up on substantiated CCRB charges, is understaffed and under-utilized. Furthermore, in the rare event that the CCRB substantiates a complaint and the Department Advocate proves the case in an internal trial against an officer, the police commissioner still maintains the power to reduce the discipline against such an officer, a power the commissioner often wields.

51. Despite the existence of oversight mechanisms, the complaint procedure provides seemingly countless opportunities for City agencies to dismiss or disregard legitimate, credible complaints.

52. Due to the failures of the CCRB, many abuses of authority by police officers go unreported. Officers are thus free to abuse their authority with little or no fear of repercussions.

53. Here, the lack of accountability contributed to the defendant police officers' actions described above in that the officer defendants knew they were insulated from any repercussions for their unlawful actions against Plaintiff.

---

[8] *See* Nathan Tempey, *CCRB: Cop Who Shoved Kid Through Hookah Bar Window Used Excessive Force*, gothamist, July 28, 2015, http://gothamist.com/2015/07/28/bronx_hookah_window_ccrb.php (reporting that in 2014, the CCRB substantiated only 327 of nearly 5,000 complaints, and that the NYPD disciplined 10 2 officers in that same period. Of the officers disciplined, only 22 faced administrative charges); WNYC.org, *Police Punishment: CCRB vs NYPD*, http://project.wnyc.org/ccrb/ (last visited July 23, 2015) (reporting that, in 2012, police officers received no discipline in 104 cases (40.3%) of the substantiated complaints processed (258); in 2013, the NYPD dropped 28.3% of the substantiated complaints without any disciplinary action; in 2014, it dropped 24.5%).

## THE CITY HAS ENCOURAGED UNCONSTITUTIONAL STOPS THROUGH ITS USE OF ARREST QUOTAS

54.     The City has also been alerted to the regular use of stop, question, and frisk by its police officers, which disproportionately target people of color, despite the lack criminal evidence that such police intrusion actually produce, and despite the humiliation, inconvenience, and constitutional violations that the majority of law-abiding people, mostly in communities of color, suffer as a result.

55.     Even as the use of stop, question, and frisk has declined precipitously in recent years – in large part due to the federal class action lawsuit *Floyd, et al. v. City of New York, et al*., 08-CV-1034 (SAS) – the police have continued to use the policing tactic in a severely racially disproportionate manner, and for the improper purpose of meeting "performance goals" (more commonly known as arrest quotas).

56.     According to data collected by the New York Civil Liberties Union ("NYCLU"), in 2014, New Yorkers were stopped by the police 46,235 times. Of the people stopped:  38,051 were totally innocent of any crime (82%); 24,777 were Black (55%); 12,662 were Latino (29%); and 5,536 were white (12%).[9]

57.     The City is also aware that the misconduct does not stop at the regular use of stop and frisks to violate the civil rights of innocent people.  For example, the NYCLU reported that more than 85% of summonses for Open Container were given to Black and Latino New Yorkers, whereas white recipients made up merely 4%.[10]  The grossly disproportionate issuance of summonses to New Yorkers of color led one Kings County judge to note that he could not recall

---

[9] *See* NYCLU, *Stop and Frisk Campaign: About the Issue*, http://www.nyclu.org/content/stop-and-frisk-data (last visited July 22, 2015).

[10] *See* NYCLU, *Testimony Before City Council Public Safety & Courts and Legal Services Committees On Summons Court Operations and Impact*, http://www.nyclu.org/content/testimony-city-council-public-safety-courts-and-legal-services-committees-summons-court-oper.

ever having arraigned a white defendant on an open container charge.[11]

58. Police officers have repeatedly told New York City news investigations that their supervisors pressure them into reaching "performance goals," resulting in the violation of innocent New Yorker's civil rights.[12]

59. The City's inability to prevent its officers from abusing the stop and frisk policy is emblematic of the City's continuing failures to exercise adequate control over the NYPD, and to prevent police officers from abusing their authority. Such failures have led to further abuse of authority by police officers, including the incident underlying plaintiff's Complaint.

60. All of the aforementioned has created a climate where police officers and detectives lie to prosecutors and in police paperwork and charging instruments, and testify falsely, with no fear of reprisal. As the Honorable Jack Weinstein, United States District Court Judge for the Eastern District of New York, has written:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration—through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department—there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

*Colon v. City of New York*, No. 09-CV-8, 2009 WL 4263362, at *2 (E.D.N.Y. Nov. 25, 2009).

61. The City is aware that all of the aforementioned has resulted in violations of citizens'

---

[11] *People v. Figueroa*, 36 Misc.3d 605, 608 (Kings Co. 2012).

[12] *See* Jim Hoffer, *NYPD Officer Claims Pressure to Make Arrests*, WABC News ( (Mar. 2, 2010, 10:37 PM), http://7online.com/archive/7305356/ and Jim Hoffer, *Kelly Responds to Our NYPD Quotas,* WABC News (May 25, 2010, 3:31 PM), http://7online.com/archive/7461355/.

constitutional rights. Despite such notice, the City has failed to take corrective action. This failure and these policies caused the officers in the present case to violate plaintiff's civil rights, without fear of reprisal.

62. Plaintiff has been damaged as a result of the City's deliberate indifference.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, as follows:

A. In favor of plaintiff in an amount to be determined by a jury for each of plaintiff's causes of action;

B. Awarding plaintiff punitive damages in an amount to be determined by a jury;

C. Awarding plaintiff reasonable attorneys' fees, costs and disbursements of this action; and

D. Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: January 20, 2016
Brooklyn, New York

Respectfully yours,

Nicole Bellina, Esq.
Stoll, Glickman & Bellina, LLP
475 Atlantic Avenue, 3rd Floor
Brooklyn, NY 11217
(718) 852-3710

TO:
City of New York
100 Church Street
New York, NY 10007

Officer Orlando Sanchez
Det. Rashon Lacoste
Det. Kevin Desormeau
Brooklyn North Gang Unit
1 Police Plz
New York, NY 10009